```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
NATIONAL CREDIT UNION ADMINISTRATION    :
BOARD, as Liquidating Agent of          :
Southwest Corporate Federal Credit      :   13 Civ. 6719 (DLC)
Union and Members United Corporate      :
Federal Credit Union,                   :   OPINION & ORDER
                                        :
                    Plaintiff,          :
-v-                                     :
                                        :
WACHOVIA CAPITAL MARKETS, LLC, now known:
as WELLS FARGO SECURITIES, LLC,         :
                                        :
                    Defendant.          :
                                        :
----------------------------------------X
```

APPEARANCES:

For the Plaintiff:

David Fredrick, Wan J. Kim, Gregory G. Rapawy, and Andrew C. Shen
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
Sumner Square, 1615 M Street, N.W., Suite 400
Washington, DC 20036

David H. Wollmuth, Fredrick R. Kessler, Steven S. Fitzgerald, and Ryan A. Kane
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue, 12th Floor
New York, NY 10010

George A. Zelcs
Korein Tillery LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601

Stephen M. Tillery, Greg G. Gutzler, Peter H. Rachman, and Robert L. King
Korein Tillery LLC
505 North Seventh Street, Suite 3600
St. Louis, MO 63101

For the Defendant:

Andrew W. Goldwater
Friedman Kaplan Seiler & Adelman LLP
7 Times Square
New York, NY 10036

David H. Fry, Christian K. Wrede, and Hannah E. Shearer
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105


DENISE COTE, District Judge:

   This Opinion addresses a motion to dismiss filed in one of seven actions brought in this district by the National Credit Union Administration Board ("NCUA"), as liquidating agent of Southwest Corporate Federal Credit Union ("Southwest") and Members United Corporate Federal Credit Union ("Members United") (collectively, the "Credit Unions").  NCUA has sued various financial institutions involved in the packaging, marketing, and sale of residential mortgage-backed securities ("RMBS") that the Credit Unions purchased in the period from 2005 to 2007.[1]  The

---

[1] Nat'l Credit Union Admin. Bd. ("NCUA") v. Morgan Stanley & Co., Inc., et al., 13 Civ. 6705 (DLC); NCUA v. Wachovia Capital Markets, LLC n/k/a Wells Fargo Secs., LLC, 13 Civ. 6719 (DLC); NCUA v. Goldman Sachs & Co., et al., 13 Civ. 6721 (DLC); NCUA v. RBS Secs., Inc., et al., 13 Civ. 6726 (DLC); NCUA v. Barclays Capital, Inc., 13 Civ. 6727 (DLC); NCUA v. UBS Secs., LLC, 13 Civ. 6731 (DLC); and NCUA v. Credit Suisse Secs. (USA) LLC, et al., 13 Civ. 6736 (DLC).
   Two other actions, initially brought by NCUA, have since settled.  NCUA v. Bear Stearns & Co., et al., 13 Civ. 6707 (DLC); NCUA v. Residential Funding Secs., LLC n/k/a Ally Secs., LLC, 13 Civ. 6730 (DLC).

2

complaints in the NCUA actions generally assert that the Offering Documents used to market and sell RMBS to the Credit Unions during the relevant period contained material misstatements or omissions with respect to (1) whether the underlying mortgage loans were underwritten according to certain risk guidelines, and (2) certain statistics regarding the quality of the underlying loans, including the loan-to-value ("LTV") ratio, the owner-occupancy status, and the borrowers' debt-to-income ("DTI") ratio.

The Court has already issued an Opinion addressing a motion to dismiss filed in the lead case brought by NCUA: <u>NCUA v. Morgan Stanley & Co., Inc., et al.</u>, 13 Civ. 6705 (DLC), 2014 WL 241739 (S.D.N.Y. Jan. 22, 2014) ("<u>Morgan Stanley</u>").  Familiarity with that Opinion is assumed; all capitalized terms have the meanings previously assigned to them.

This action is brought against Wachovia Capital Markets, LLC ("Wachovia"), now known as Wells Fargo Securities, LLC, and it asserts claims under the Texas Securities Act, <u>Tex. Rev. Civ. Stat. Ann.</u> art. 581, § 33 (2013) ("Texas Blue Sky Law"). Wachovia has moved to dismiss many of the claims brought against it.  For the reasons set forth below, the motion is denied.

---

Seven other actions are currently being brought by NCUA against these and other defendants in Kansas and California.

3

BACKGROUND

This case concerns two RMBS Certificates that were underwritten and sold by Wachovia and purchased by Southwest: WMLT 2006-AMN1 ("AMN1") and WMLT 2006-ALT1 ("ALT1"). Both Certificates were rated AAA. AMN1 and ALT1 were purchased in June and December 2006, respectively, for a total of $25,738,350. By mid-2009, the Certificates were downgraded to junk status. By June of 2013, approximately 25% of the loans for each Certificate were delinquent.

Four originators were involved in these securities. For AMN1, American Mortgage Network, Inc. ("AmNet") originated 100% of the loans in the security. For ALT1, four originators contributed loans in the security: National City Mortgage Co. (~66% of the loans), Accredited Home Lenders, Inc. (~19%), Wachovia Mortgage Corp. (~12%), and AmNet (~3%). As relevant here, NCUA alleges that AmNet's percentage of loans "originated for distribution" was 90.3% in 2006 and 71.9% in 2007.

The Wachovia complaint asserts material misstatements in the Offering Documents with respect to the statistics relating to the quality of the underlying loans, with an emphasis on LTV ratios and owner-occupancy rates. A portion of the complaint discusses the results of a forensic analysis of the ALT1 security, which found materially higher LTV ratios and lower owner-occupancy rates than those listed in the Offering

4

Documents for ALT1.  The complaint also asserts that the Offering Documents contained material misstatements with respect to originators' compliance with the underwriting guidelines (and the reduced documentation program underwriting guidelines).

On February 5, 2014, following this Court's ruling on the motion to dismiss in Morgan Stanley, Wachovia moved to dismiss most of the claims in this action.[2]  In an Order of February 7, that motion was stayed pending resolution of a motion to transfer filed before the Judicial Panel on Multi-District Litigation Panel ("JPML").  On February 12, the JPML denied the motion to transfer.  Following a conference with the parties on March 11, the stay was lifted, and a schedule was entered for briefing the motion to dismiss.  The motion became fully submitted as of April 25, 2014.

DISCUSSION

Wachovia's present motion consists of essentially two sets of arguments.  First, Wachovia moves to dismiss all claims concerning misrepresentations in the Offering Documents for AMN1, arguing that NCUA has failed to plead sufficient

---

[2] The Court scheduled briefing on the motion to dismiss the lead NCUA case -- NCUA v. Morgan Stanley, 13 Civ. 6705 (DLC) -- and stayed such briefing in the related cases until it had filed its Opinion on that motion.  In the event that the motion were denied, which it was in significant part, the Court advised the parties that discovery would proceed in all actions and that any motions to dismiss in the remaining actions could be filed.

5

allegations regarding AmNet, the originator that contributed the loans underlying AMN1.  Second, Wachovia moves to dismiss all claims concerning misrepresentation of LTV and DTI ratios.

Both sets of these arguments have been addressed in this Court's previous Opinions, the Opinion in Morgan Stanley and two Opinions in the RMBS cases brought by the Federal Housing Finance Agency ("FHFA"), as conservator of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Fed. Hous. Fin. Agency ("FHFA") v. UBS Americas, Inc., et al., 858 F. Supp. 2d 306 (S.D.N.Y. 2012) ("UBS"); FHFA v. JPMorgan Chase & Co., 902 F. Supp. 2d 476, 493 (S.D.N.Y. 2012) ("JPMorgan").  The Court hereby adopts by reference the legal standards and reasoning in these prior Opinions.  The claims at issue here are strict liability claims subject to the pleading standard set forth in Rule 8(a), Fed.R.Civ.P.  Morgan Stanley, 2014 WL 241739, at *15.  Any claim must be "plausible on its face."  Id.  Only a brief discussion is necessary to apply the standards described in these prior Opinions to the arguments raised by Wachovia.

I. Adequacy of Claims Regarding AMN1

The parties agree that, for NCUA to state plausibly any claims regarding misrepresentations about underwriting conduct in the Offering Documents relating to AMN1, it must set forth

6

originator-specific allegations.  Morgan Stanley, 2014 WL 241739, at *16 (citing N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., 709 F.3d 109, 122 (2d Cir. 2013)).  The parties acknowledge that these allegations may be supported by "government reports, court filings, and other publicly available information."  Id.  Wachovia contends NCUA's allegation that AmNet had a high percentage of "originate-to-distribute" loans is insufficient to state a claim as to AMN1.

NCUA has plausibly pled its claims related to the underwriting conduct for loans contained in AMN1.  In reaching this conclusion, the Court is mindful that there is no single set of allegations that every plaintiff must include to state a plausible claim regarding an originator's underwriting practices.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  This determination requires "[v]iewing the allegations of the complaint as a whole," Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1323 (2011), and is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  Thus, each complaint must be examined in its totality to determine whether its set of allegations and the context it

provides for those allegations meet the pleading standard at issue.  See N.J. Carpenters, 709 F.3d at 123 n.7 (refusing to set forth a "minimum" that a plaintiff must plead for RMBS strict liability claims).  That examination shows that Wachovia's motion is premised on an unfairly restricted reading of the complaint, and that the complaint comfortably pleads a plausible claim regarding AmNet and AMN1.

As explained in the complaint, the practice of originating mortgages in order to sell (or distribute) them through the securitization process encouraged shoddy underwriting practices because the securitization of mortgage loans breaks down the direct relationship between the borrower and the lender.  The originator of the loan, which is the party enforcing the underwriting standards, and the securitizer of the loans have minimal risk if the borrower defaults on her mortgage payment.  The investor in the security bears that credit risk, but has the least information about the borrower or the originator's underwriting standards and conduct.  The complaint alleges, quoting a 2011 white paper issued by the Financial Stability Oversight Council ("FSOC"), that the "originate-to-distribute model" compensated originators based on volume rather than the quality of the mortgages and thus "exacerbated" the circumstances wherein originators "lower[ed] underwriting

8

standards in ways that investors may have difficulty detecting."[3]

The sole originator with respect to AMN1, AmNet, had a very high originate-to-distribute ratio. In 2006, the year AMN1 was sold, it was 90.3%. Within one year of the securitization, over 5% of the mortgages represented by that Certificate were delinquent or in default. That trend has only worsened, as described above. Because AmNet was the sole originator of the loans contained in AMN1, the performance of the loans underlying that Certificate permit inferences not only about the quality of the loans but also about AmNet itself and its underwriting practices. These allegations, when viewed in their totality, create a plausible inference that AmNet systematically failed to comply with its reported underwriting guidelines, and thus that the allegations of misstatements in the Offering Documents relating to the underwriting conduct for the AMN1 loans are plausible. See Morgan Stanley, 2014 WL 241739, at *16 (stating that a "linkage" between "security-specific allegations" and "originator-specific allegations" "raises a plausible inference of a material misstatement or omission by the defendants with respect to whether the loans complied with underwriting practices").

---

[3] Financial Stability Oversight Council, Macroeconomic Effects of Risk Retention Requirements, at 3 (Jan. 2011), available at http://www.treasury.gov/initiatives/wsr/Documents/Section%20946%20Risk%20Retention%20Study%20%20(FINAL).pdf.

9

This conclusion is underscored by Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 772-74 (1st Cir. 2011), the First Circuit decision that the Second Circuit adopted in N.J. Carpenters, 709 F.3d at 122. In Nomura, the originator at issue was alleged to have a "business model[] aimed at milling applications at high speed to generate profits from the sale of such risky loans to others." 632 F.3d at 772 (citation omitted). It allegedly "approved as many loans as possible, even scrubbing loan applications of potentially disqualifying material." Id. (citation omitted). The First Circuit described these allegations as "fairly specific," id. at 773, and thus sufficient to survive a motion to dismiss. Id. at 774. AmNet is alleged to have an analogous business model here, as explained above. Accordingly, Wachovia's motion to dismiss the claims as to AMN1 is denied.

Wachovia disputes that originate-to-distribute percentages reflect abandonment of underwriting guidelines, arguing that such percentages are a "post-origination" statistic that are "consistent with" but do not "plausibly suggest" that AmNet abandoned its underwriting guidelines. A 90.3 originate-to-distribute ratio cannot be dismissed as a post-hoc statistic. It is not just plausible, but indeed likely, that AmNet achieved this impressive rate of distribution by designing and implementing a business model to sell the mortgages it

originated.  If that is so, then the findings by the FSOC about the impact of such a business model on underwriting practices are highly relevant, and permit a reasonable inference to be drawn that AmNet abandoned its underwriting guidelines.

Wachovia also argues that the originator-specific facts are too thin when compared to the facts in N.J. Carpenters and Nomura.  It argues that NCUA cannot rely on an originate-to-distribute ratio to support an allegation about the nature of an originator's underwriting practices.  Wachovia misreads those precedents and the complaint.  To begin, the facts here are analogous to those in Nomura, as explained above.  Moreover, the facts in N.J. Carpenters on which Wachovia relies (e.g., the existence of confidential witnesses) were not essential to the Second Circuit's holding.  A virtually identical argument was made and rejected in Morgan Stanley.  2014 WL 241739, at *16 n.16.  Additionally, as explained above, there is no litmus test under Rule 8(a), Fed.R.Civ.P., and Wachovia's attempt to impose a pleading straight jacket on NCUA based on the facts in N.J. Carpenters and Nomura is misguided.  Finally, Wachovia misreads the complaint as relying solely on an originate-to-distribute ratio to state a claim about an originator's underwriting practices.  Here, because AmNet was the sole originator for AMN1, the poor performance of the Certificate and the Certificate's loans sheds additional light on the originator's

11

practices. Together, the distribution ratio and the performance data are more than sufficient to state a plausible claim that this originator engaged in the alleged underwriting practices, and thus a plausible claim as to Wachovia's misrepresentations about that underwriting conduct in the Offering Documents relating to AMN1.

II. Adequacy of Claims Regarding LTV and DTI ratios

Wachovia next argues that all claims regarding misstatements with respect to LTV and DTI ratios must be dismissed. It asserts that the allegation regarding LTV ratios must be dismissed since the complaint does not adequately plead that appraisers did not believe in the accuracy of their appraisals. Wachovia also points out that there are no specific allegations at all regarding DTI ratios for either Certificate.

The complaint's allegations regarding the underwriting process generally for these two Certificates are as follows. The troubling performance data, including mortgage delinquency rates and the collapse in the credit ratings for each Certificate, have been recounted above. In addition, Wachovia has not challenged the sufficiency of the allegations regarding the originators' lack of compliance with underwriting guidelines as to ALT1, and the plausibility of such allegations as to AMN1 has just been addressed. The complaint also describes the

12

results of forensic reviews for the loans that could be identified in the pools backing the ALT1 Certificate.  Using a valuation model that permitted a calculation of property values in 2006 for roughly 35% of the loans within ALT1, the review determined that the Offering Documents materially understated the LTV ratios for those loans.  A separate forensic review of roughly 60% of the ALT1 loans showed that the Offering Documents materially overstated the percentage of owner-occupied properties.  Taken together, these allegations plead a plausible claim regarding the misrepresentations of LTV and DTI ratios for both Certificates.

     Wachovia principally challenges the adequacy of NCUA's pleadings with respect to LTV ratios.  It asserts that, because LTV ratios are based on appraisals that are matters of opinion, the plaintiff must "show that the estimates were both objectively false and disbelieved by the speaker when made ('subjectively false')."  UBS, 858 F. Supp. 2d at 325 (citing Fait v. Regions Fin. Corp., 655 F.3d 105, 113 (2d Cir. 2011)).  Citing UBS, Wachovia argues that NCUA failed to allege subjective falsity, i.e., that the appraisers did not believe their own appraisals.

     To begin, some of the LTV ratios at issue here do not incorporate appraisal values.  They are based instead on the purchase price for the property, and are therefore clearly

representations of fact and not opinion.

In any event, UBS provides little assistance to Wachovia. In UBS, this Court rejected the defendants' argument that the representations in the Offering Documents about LTV ratios and housing appraisals were not actionable because they were statements of opinion and not fact.  858 F. Supp. 2d at 324-28. The UBS Opinion held that an appraisal constitutes a factual statement in the sense that it "represents the appraiser's true belief as to the value of the property," and that liability could attach to that implied assertion where the assertion is shown to be false.  Id. at 326.  Relying on that analysis, the UBS Opinion examined whether the plaintiff had adequately alleged that the appraisals, as presented through the LTV ratios "were both false and not honestly believed when made."  Id. at 328 (citation omitted).  The Opinion found that the forensic review conducted in that case showed that the "LTV data reported in the offering materials deviates so significantly from the results of plaintiff's loan-loan level analysis as to raise a plausible inference that the appraisers knowingly inflated their valuations."  Id.  The plaintiff in UBS had also relied on a "series of news stories, lawsuits and government investigations that have revealed instances in which appraisers connected to some of the mortgage originators at issue were found to have systematically and knowingly overstated the value of homes in

order to allow borrowers to obtain larger loans than they could afford." Id.  Relying on such robust allegations, the complaint in UBS so comfortably stated a plausible claim that this Court did not confront, and thus did not decide, the threshold for pleading falsity of statements regarding LTV ratios.

It is likewise unnecessary here to decide the threshold for pleading falsity of statements regarding LTV ratios.  After all, under the ordinary Rule 8(a) pleading standard as applied to state-of-mind elements of a non-fraud claim, a plaintiff need only plead facts that permit a reasonable inference of subjective falsity.  See, e.g., Nielsen v. Rabin, ___ F.3d ___, 2014 WL 552805 (2d Cir. Feb. 13, 2014) (applying the Rule 8 standard in the context of a deliberate indifference mental state for a Section 1983 claim).  As was true in UBS, the plaintiff has more than adequately pleaded such a claim.

The complaint includes an industry-wide allegation of inflated appraisal prices, stating that mortgage fraud "flourished" during the period of time in question.  In doing so, NCUA cites to the same 2012 Report by the Financial Crisis Inquiry Commission that was cited in UBS.  In addition, NCUA adds allegations regarding the results of its forensic review of loans underlying one of the two Certificates.

Notwithstanding the fact that a forensic review is not necessary to pleading falsity of statements regarding LTV

15

ratios,[4] Wachovia nevertheless takes issue with NCUA's forensic review here.  Wachovia argues, citing Opinions of this Court in the FHFA actions, that the numerical disparity shown by a forensic review is insufficient on its own to establish subjective falsity.  The cases cited, however, concern the question of whether a numerical disparity is sufficient to establish scienter in fraud claims, not subjective falsity in strict liability claims.  See, e.g., JPMorgan, 902 F. Supp. 2d at 493; see also UBS, 858 F. Supp. 2d at 326-27 (distinguishing subjective falsity in strict liability claims from scienter in fraud claims).

Wachovia also objects that there was no forensic review conducted for loans underlying AMN1.  But, just as there is no requirement that a forensic review be conducted for loans underlying any Certificate, in the event a plaintiff relies on a forensic review, there is no need that the forensic review be conducted for each Certificate.  See JPMorgan, 902 F. Supp. 2d at 488 (noting that, in JPMorgan, forensic review of loan files was conducted for three of 127 Certificates and that, in UBS, forensic review was conducted for three of twenty-two Certificates).  The linkage between a Certificate and the systematic failure alleged in a complaint may be provided by the

---

[4] For the reasons explained in JPMorgan, a plaintiff has no burden to undertake such a forensic review to state a claim. 902 F. Supp. 2d at 489-90.

performance of the loans underlying the Certificate, or the credit-rating history of each Certificate.  Id. at 488-49.  That linkage has been adequately established here, as explained above.

Finally, Wachovia briefly objects that there are insufficient allegations regarding the falsity of the DTI ratios, particularly given the absence of any forensic analysis concerning the accuracy of the ratios reported in the Offering Documents.  The troubling delinquency record for each Certificate, when combined with the other allegations in the complaint, is sufficient to state a plausible claim that the DTI ratios were also false.  See Morgan Stanley, 2014 WL 241739, at *16.

CONCLUSION

Defendant's February 5, 2014 motion to dismiss is denied.

Dated:   New York, New York
         May 6, 2014

_____
           DENISE COTE
     United States District Judge

17