## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of Southwest Corporate Federal Credit Union, | ) ) ) ) ) |
| | ) Case No. 13-cv-6719 (DLC) |
| Plaintiff, | ) |
| | ) **JURY TRIAL DEMANDED** |
| v. | ) |
| | ) |
| | ) |
| WACHOVIA CAPITAL MARKETS, LLC, | ) |
| n/k/a WELLS FARGO SECURITIES, LLC, | ) |
| | ) |
| Defendant. | ) |

## <u>FIRST AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ............................................................................1

       Table 1 .......................................................................................................3

II.    PARTIES AND RELEVANT NON-PARTIES ..............................................3

III.   JURISDICTION AND VENUE ....................................................................5

IV.   MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION...............6

       Figure 1
       *Illustration of the Securitization Process*.................................................8

V.    RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT .......................................9

       Table 2
       *Credit Ratings* ........................................................................................9

VI.   SOUTHWEST'S  PURCHASES.................................................................11

       Table 3
       *Credit Ratings for Southwest's RMBS Purchases* .............................12

VII.  THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS.........................................................................................12

       A.    The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards...................................................................13

       Table 4
       *Delinquency and Default Rates for Southwest's RMBS Purchases*...................................14

       Table 5
       *Originator "Originate-to-Distribute" Percentages* .........................................16

       B.    The Surge in Actual Versus Expected Cumulative Gross Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards ......................................................16

Figure 2
*Illustration of Expected Gross Losses v. Actual Gross Losses for
Southwest's RMBS Purchases* ..................................................................................19

C.    The Collapse of the Certificates' Credit Ratings is Evidence of
Systematic Disregard of Underwriting Guidelines .................................................21

D.    Revelations Subsequent to the Offerings Show That the
Originators Systematically Disregarded Underwriting
Standards ...................................................................................................................21

      1.    The Systematic Disregard of Underwriting Standards
Was Pervasive as Revealed After the Collapse .......................................21

      2.    National City Mortgage's Systematic Disregard of
Underwriting Standards ............................................................................26

VIII.  THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS
OF MATERIAL FACT .........................................................................................................27

A.    Untrue Statements in the Offering Documents About Weighted
Average LTV Ratios and Weighted Average Combined LTV
Ratios .......................................................................................................................27

Table 6
*Untrue Statements in the Offering Documents About Weighted
Average LTV Ratios* ................................................................................................29

Table 7
*Untrue Statements in the Offering Documents About Weighted
Average CLTV* .........................................................................................................30

B.    Untrue Statements in the Offering Documents About Owner
Occupancy Rates ......................................................................................................30

Table 8
*Untrue Statements in the Offering Documents About Owner-
Occupancy Status* ...................................................................................................33

C.    Other Untrue Statements in the Offering Documents ............................................33

Table 9
*Originators Supplying Loans for Each RMBS at Issue* .........................................34

      1.    Untrue Statements Concerning Adherence to
Underwriting Guidelines ...........................................................................34

2.      Untrue Statements Concerning Adherence to Reduced
        Documentation Program Underwriting Guidelines ...................................36

3.      Untrue Statements Concerning Loan-to-Value Ratios,
        Owner-Occupancy Rates, and DTI Ratios................................................38

IX.     THE CLAIMS ARE TIMELY..........................................................................................39

X.      CLAIMS FOR RELIEF ...................................................................................................41

        COUNT ONE
        Violation of the Texas Securities Act
        Tex. Rev. Civ. Stat. Ann. art. 581, § 33
                (Wachovia Mortgage Loan Trust, Series 2006-AMN1,
                Wachovia Mortgage Loan Trust, Series 2006-ALT1)...........................................41

        Appendix.......................................................................................................................... 44

Plaintiff, the National Credit Union Administration Board ("NCUA Board"), brings this action in its capacity as Liquidating Agent of Southwest Corporate Federal Credit Union ("Southwest") against Wachovia Capital Markets n/k/a Wells Fargo Securities, LLC ("Wachovia") as underwriter and seller, of certain residential mortgage-backed securities ("RMBS") purchased by Southwest, and alleges as follows:

## I.        NATURE OF THE ACTION

1.        This action arises out of the sale of RMBS to Southwest where Wachovia acted as underwriters and/or seller of the RMBS.

2.        Both of the RMBS sold to Southwest were rated as triple-A (the same rating as U.S. Treasury bonds) at the time of issuance.

3.        Wachovia underwrote and sold the RMBS pursuant to registration statements, prospectuses, prospectus supplements, term sheets, free writing prospectuses, and other written materials (collectively, the "Offering Documents").  These Offering Documents contained untrue statements of material fact or omitted to state material facts in violation of Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581, § 33 ("Texas Blue Sky Law").

4.        The Offering Documents described, among other things, the mortgage underwriting standards of the originators who made the mortgages that were pooled and served as the collateral for the RMBS purchased by Southwest ("the Originators").

5.        The Offering Documents represented that the Originators adhered to the underwriting guidelines set out in the Offering Documents for the mortgages in the pools collateralizing the RMBS.

6.        The Offering Documents also represented that the loan pools underlying the RMBS had certain characteristics.  These material representations included the weighted average

1

loan-to-value ("LTV") ratios, certain weighted average combined loan-to-value ("CLTV") ratios, and certain owner-occupancy rates ("OOR").

7.      LTV represents the amount of the loans as a percentage of the value of the mortgaged properties.  A lower LTV indicated that the loans were less likely to default because the borrower had greater equity, and in the event of default, that the balance of the loans could be recovered by selling the properties.

8.      OOR represents the percentage of borrowers who occupied the mortgaged properties.  A higher OOR indicated that the loans were less likely to default, as borrowers are much less likely to default on their primary residence than an investment property or vacation home.

9.      In fact, the Originators had systematically abandoned the stated underwriting guidelines in the Offering Documents.  Because the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards in the Offering Documents, the RMBS were significantly riskier than represented.

10.      These untrue statements and omissions were material because the value of RMBS is largely a function of the cash flow from the principal and interest payments on the mortgage loans collateralizing the RMBS.  Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan.

11.      Southwest purchased certain RMBS underwritten and/or sold by Wachovia as indicated in Table 1 (*infra*).  Wachovia is therefore liable for material untrue statements and omissions of fact in the Offering Documents for these RMBS under the Texas Blue Sky Law as indicated in Table 1 (*infra*).

**Table 1**

| CUSIP[1] | Issuing Entity | Depositor | Purchaser | Trade Date | Price Paid | Claims |
|---|---|---|---|---|---|---|
| 92978GAA7 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 | Wachovia Mortgage Loan Trust, LLC | Southwest | 8/2/2007 | $10,738,350 | Texas Blue Sky |
| 92978EAB0 | Wachovia Mortgage Loan Trust, Series 2006-AMN1 | Wachovia Mortgage Loan Trust, LLC | Southwest | 6/9/2006 | $ 15,000,000 | Texas Blue Sky |

12.     The RMBS Southwest purchased suffered a significant drop in market value. Southwest has suffered significant losses from those RMBS purchased despite the NCUA Board's mitigation efforts.

## II.     PARTIES AND RELEVANT NON-PARTIES

13.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF").  The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") for the purposes of stabilizing corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation.  The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021 through assessments against all federally insured credit unions in the country.  The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions.  The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF.  The NCUA is under the management of the NCUA Board.

---

[1] "CUSIP" stands for "Committee on Uniform Securities Identification Procedures."  A CUSIP number is used to identify most securities, including certificates of RMBS.  *See* CUSIP Number, http://www.sec.gov/answers/cusip.htm.

*See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCU Act").

14.     Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas.  As a corporate credit union, Southwest provided investment and financial services to other credit unions.

15.     On September 24, 2010, the NCUA Board placed Southwest into conservatorship pursuant to the FCUA, 12 U.S.C. § 1751, *et seq*.  On October 31, 2010, the NCUA Board placed Southwest into involuntary liquidation, appointing itself Liquidating Agent.

16.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of Southwest and of any member, account holder, officer or director of Southwest, with respect to Southwest and their assets, including the right to bring the claims asserted in this action.  As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of Southwest, and succeeds to all rights, titles, powers, and privileges of Southwest.  *See* 12 U.S.C. §1787(b)(2)(A). The NCUA Board may also sue on the Southwest's behalf.  *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

17.     Prior to being placed into conservatorship and involuntary liquidation, Southwest was one of the largest corporate credit unions in the United States.

18.     Any recoveries from this legal action will reduce the total losses resulting from the failure of Southwest.  Losses from Southwest's failure must be paid from the NCUSIF or the TCCUSF.  Expenditures from these funds must be repaid through assessments against all federally insured credit unions.  Because of the expenditures resulting from Southwest's failure, federally insured credit unions will experience larger assessments, thereby reducing federally insured credit unions' net worth.  Reductions in net worth can adversely affect the dividends that

individual members of credit unions receive for the savings on deposit at their credit union. Reductions in net worth can also make loans for home mortgages and automobile purchases more expensive and difficult to obtain.  Any recoveries from this action will help to reduce the amount of any future assessments on credit unions throughout the system, reducing the negative impact on federally insured credit unions' net worth.  Recoveries from this action will benefit credit unions and their individual members by increasing net worth resulting in more efficient and lower-cost lending practices.

19.     Wachovia was an SEC broker-dealer.  Wachovia acted as an underwriter of the RMBS that are the subject of this Complaint as indicated in Table 1 (*supra*).  Wachovia was a wholly-owned subsidiary of Wachovia Corp.  In 2009, Wachovia Corp. merged with Wells Fargo & Co.  As a result of that merger, Wachovia is now known as Wells Fargo Advisors, LLC. Wells Fargo Advisors, LLC is a Delaware corporation with its principal place of business in Missouri.

## III.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to:  (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; and (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

21.     Venue is proper in this District under 28 U.S.C. §1391(b)(1), because the Defendant is a resident of/conducts business in this District.  This Court has personal jurisdiction over the Defendant because it is a resident of/conducts business in this District.

**IV.     MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION**

22.     RMBS are asset-backed securities.  A pool or pools of residential mortgages are the assets that back or collateralize the RMBS certificates purchased by investors.

23.     Because residential mortgages are the assets collateralizing RMBS, the origination of mortgages commences the process that leads to the creation of RMBS. Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting.  The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.  The underwriting guidelines consist of a variety of metrics, including: the borrower's debt, income, savings, credit history and credit score; whether the property will be owner-occupied; and the loan-to-value ("LTV") ratio, among other things.  Loan underwriting guidelines are designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in the event of default.

24.     Historically, originators made mortgage loans to borrowers and held the loans on their own books for the duration of the loan.  Originators profited as they collected monthly principal and interest payments directly from the borrower.  Originators also retained the risk that the borrower would default on the loan.

25.     This changed in the 1970s when the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively government sponsored enterprises or "GSEs") began purchasing "conforming" or "prime" loans —so-called because they conformed to guidelines set by the GSEs.  The GSEs either sponsored the RMBS issuance (Ginnie Mae) or issued the RMBS themselves after purchasing the conforming loans (Fannie

Mae and Freddie Mac).  The GSEs securitized the mortgage loans by grouping mortgages into "loan pools," then repackaging the loan pools into RMBS where investors received the cash flow from the mortgage payments.  The GSEs guarantee the monthly cash flow to investors on the agency RMBS.

26.     More recently, originators, usually working with investment banks, began securitizing "non-conforming loans"—loans originated (in theory) according to private underwriting guidelines adopted by the originators.  Non-conforming loans are also known as "nonprime loans" or "private label" and include "Alt-A" and "subprime" loans.  Despite the non-conforming nature of the underlying mortgages, the securitizers of such RMBS were able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*) when they securitized the non-conforming loans.

27.     All of the loans collateralizing the RMBS at issue in this Complaint are non-conforming mortgage loans.

28.      The issuance of RMBS collateralized by non-conforming loans peaked in 2006.  The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages, to ensuring that the originator could process (and obtain fees from) an ever-larger loan volume for distribution as RMBS.  This practice is known as "originate-to-distribute" ("OTD").

29.     Securitization begins with a "sponsor" who purchases loans in bulk from one or more originators.  The sponsor transfers title of the loans to an entity called the "depositor."

30.     The depositor transfers the loans to a trust called the "issuing entity."

31.     The issuing entity issues "notes" and/or "certificates," representing an ownership interest in the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and

interest generated as borrowers make monthly payments on the mortgages in the pool).

32.    The depositor files required documents (such as registration statements and prospectuses) with the SEC so that the certificates can be offered to the public.

33.    One or more "underwriters" then sell the notes or certificates to investors.

34.    A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes the income stream generated from the mortgage loan payments to the RMBS investors.

35.    Figure 1 (*infra*) depicts a typical securitization process.

**Figure 1**
*Illustration of the Securitization Process*



36.    Because securitization, as a practical matter, shifts the risk of default on the

mortgage loans from the originator of the loan to the RMBS investor, the originator's adherence to mortgage underwriting guidelines as represented in the offering documents with respect to the underlying mortgage loans is critical to the investors' ability to evaluate the expected performance of the RMBS.

## V.    RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT

37.    RMBS offerings are generally divided into slices or "tranches," each of which represents a different level of risk.  RMBS certificates denote the particular tranches of the security purchased by the investor.

38.    The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.  Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit rating agencies that assigned credit ratings to the RMBS in this case.

39.    The credit rating agencies use letter-grade rating systems as shown in Table 2 (*infra*).

**Table 2**
*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---|---|---|---|
| Aaa | AAA | **Prime (Maximum Safety)** | **INVESTMENT GRADE** |
| Aa1 Aa2 Aa3 | AA+ AA AA- | **High Grade, High Quality** | |
| A1 A2 A3 | A+ A A- | **Upper Medium Grade** | |
| Baa1 Baa2 Baa3 | BBB+ BBB BBB- | **Medium Grade** | |
| Ba2 Ba3 | BB BB- | **Non-Investment Grade, or Speculative** | **SPECULATIVE GRADE** |
| B1 B2 B3 | B+ B B- | **Highly Speculative, or Substantial Risk** | |
| Caa2 Caa3 | CCC+ | **In Poor Standing** | |

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Ca | CCC<br>CCC- | **Extremely Speculative** | |
| C | - | **May be in Default** | |
| - | D | **Default** | |

40.     Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk."  Moody's Investors Services, Inc., Moody's Rating Symbols & Definitions at 6 (August 2003), *available at* http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf.  Likewise, S&P rates a product "AAA" when the "obligor's capacity to meet its financial commitment on the obligation is extremely strong."  Standard & Poor's, Ratings Definitions, *available at* https://www.globalcreditportal.com/ratingsdirect/renderArticle.do?articleId=1019442&SctArtId =147045&from=CM&nsl_code=LIME.

41.     In fact, RMBS could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies, because the primary market for RMBS is institutional investors, such as Southwest, which are generally limited to buying only securities with the highest credit ratings.  *See*, *e.g.*, NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities rated below AA-); *but see*, *e.g.*, Alternatives to the Use of Credit Ratings, 77 Fed. Reg. 74,103 (Dec. 13, 2012) (to be codified at 12 C.F.R. pts. 703, 704, 709, and 742).

42.      While the pool of mortgages underlying the RMBS may not have been sufficient to warrant a triple-A credit rating, various forms of "credit enhancement" were used to obtain a triple-A credit rating on the higher tranches of RMBS.

43.     One form of credit enhancement is "structural subordination."  The tranches, and their risk characteristics relative to each other, are often analogized to a waterfall.  Investors in

the higher or "senior" tranches are the first to be paid as income is generated when borrowers make their monthly payments.  After investors in the most senior tranche are paid, investors in the next subordinate or "junior" tranche are paid, and so on down to the most subordinate or lowest tranche.

44.     In the event mortgages in the pool default, the resulting loss is absorbed by the subordinated tranches first.

45.     Accordingly, senior tranches are deemed less risky than subordinate tranches and therefore receive higher credit ratings.

46.     Another form of credit enhancement is overcollateralization.  Overcollateraliza-tion is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security.  The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

47.     Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization."  "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages.  Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults.  Finally, some RMBS are "cross-collateralized," *i.e.*, when a loan group in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

## VI.    SOUTHWEST'S  PURCHASES

48.     Southwest purchased only the highest-rated tranches of RMBS.  Both were rated triple-A at the time of issuance.  These securities have since been downgraded below investment

grade just a few years after they were sold (*see infra* Table 3).

**Table 3**
***Credit Ratings for Southwest's RMBS Purchases***

| CUSIP | ISSUING ENTITY | PURCHASER | Original Rating S&P | Original Rating Moody's | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade Moody's | Recent Rating S&P | Recent Rating Moody's |
|---|---|---|---|---|---|---|---|---|
| 92978EAB0 | Wachovia Mortgage Loan Trust, Series 2006-AMN1 | Southwest | AAA 7/5/2006 | Aaa 6/29/2006 | CCC 6/25/2009 | Caa1 2/19/2009 | CCC 6/25/2009 | Caa3 4/4/2013 |
| 92978GAA7 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 | Southwest | AAA 1/3/2007 | Aaa 12/27/2006 | BB 10/27/2008 | Caa1 2/19/2009 | CCC 2/16/2010 | Caa3 11/5/2010 |

49.     At the time of purchase, Southwest was not aware of the untrue statements or

omissions of material facts in the Offering Documents of the RMBS.   If Southwest had known

about the Originators' pervasive disregard of underwriting standards—contrary to the

representations in the Offering Documents—they would not have purchased the certificates.

50.      The securities' substantial loss of market value has injured Southwest and the

NCUA Board.

## VII.   THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS

51.     The performance and value of RMBS are largely contingent upon borrowers

repaying their mortgages.  The loan underwriting guidelines ensure that the borrower has the

means to repay the mortgage and that the RMBS is secured by sufficient collateral in the event of

reasonably anticipated defaults on the underlying mortgage loans.

52.     With respect to RMBS collateralized by loans written by originators who

systematically disregarded their stated underwriting standards, the following pattern is present:

a.   a surge in borrower delinquencies and defaults on the mortgages in the pools

(*see infra* Section VII.A and Table 4);

b.  actual gross losses to the underlying mortgage pools within the first 12 months after the offerings exceeded expected gross losses (*see infra* Section VII.B and Figure 2);

c.  a high percentage of the underlying mortgage loans were originated for distribution, as explained below (*see infra* Table 5 and accompanying allegations); and

d.  downgrades of the RMBS by credit rating agencies from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings (*see infra* Section VII.C and *supra* Table 3).

53.     These factors, when considered in light of the other factual allegations in this Complaint, support a finding that the Originators failed to originate the mortgages in accordance with the underwriting standards stated in the Offering Documents.

54.     This conclusion is corroborated by reports that the Originators who contributed mortgage loans to the RMBS at issue in this Complaint abandoned the underwriting standards described in the Offering Documents (*see infra* Section VII.D).

**A.      The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards**

55.     Residential mortgages are generally considered delinquent if no payment has been received for more than 30 days after payment is due.  Residential mortgages where no payment has been received for more than 90 days (or three payment cycles) are generally considered to be in default.

56.     The surge of delinquencies and defaults following the offerings evidences the systematic flaws in the Originators' underwriting process (*see infra* Table 4).

57.     The Offering Documents reported zero or near zero delinquencies and defaults at

13

the time of the offerings (*see infra* Table 4).

58.     The pools of mortgages collateralizing the RMBS experienced delinquency and

default rates up to 2.13% within the first three months, up to 4.14% at six months, and up to

10.84% at one year (*see infra* Table 4).

59.     As of June 2013, 24.82% of the mortgage collateral across all the RMBS that

Southwest purchased was in delinquency, bankruptcy, foreclosure, or real estate owned

("REO"), which means that a bank or lending institution owns the property after a failed sale at a

foreclosure auction (*see infra* Table 4).

60.     Table 4 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO rates

on the RMBS as to which claims are asserted in this Complaint.  The data presented in the last

five columns are from the trustee reports (dates and page references are indicated in the

parentheticals).  The shadowed rows reflect the group of mortgages in the pool underlying the

specific tranches purchased by Southwest; however, some trustee reports include only the

aggregate data.  For RMBS with multiple groups, aggregate information on all the groups is

included because the tranches are cross-collateralized.

**Table 4**
***Delinquency and Default Rates for Southwest's RMBS Purchases***

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 92978GAA7 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 (P.S. dated Dec. 19, 2006) | Zero. (S-32) | 0.94% (Jan., p.14) | 2.13% (Mar., p.14) | 4.14% (June, p.14) | 10.84% (Dec., p.14) | 23.55% (June 2013, p.11) |
| 92978EAB0 | Wachovia Mortgage Loan Trust, Series 2006-AMN1 (P.S. dated June 26, 2006) | Zero. (S-29) | 0% (July, p.S14) | 0.2% (Sep., p.13) | 1.34% (Dec., p.13) | 5.6% (June, p.14) | 26.09% (June 2013, p.10) |

61.     This early spike in delinquencies and defaults, which occurred almost

immediately after these RMBS were purchased by Southwest, was later discovered to be indicative of the Originators' systematic disregard of their stated underwriting guidelines.

62.     The phenomenon of borrower default shortly after origination of the loans is known as "Early Payment Default."  Early Payment Default evidences borrower misrepresentations and other misinformation in the origination process, resulting from the systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents.

63.     In January 2011, the Financial Stability Oversight Council ("FSOC"), chaired by United States Treasury Secretary Timothy Geithner, issued a report analyzing the effects of risk retention requirements in mortgage lending on the broader economy.  *See* FIN. STABILITY OVERSIGHT COUNCIL, MACROECONOMIC EFFECTS OF RISK RETENTION REQUIREMENTS (2011) ("FSOC Risk Retention Report").  The FSOC Risk Retention Report focused on stabilizing the mortgage lending industry through larger risk retention requirements in the industry that can "incent better lending decisions" and "help to mitigate some of the pro-cyclical effects securitization may have on the economy."  *Id*. at 2.

64.     The FSOC Risk Retention Report observed that the securitization process often incentivizes poor underwriting by shifting the risk of default from the originators to the investors, while obscuring critical information concerning the actual nature of the risk.  The FSOC Risk Retention Report stated:

> The securitization process involves multiple parties with varying incentives and information, thereby breaking down the traditional direct relationship between borrower and lender.  The party setting underwriting standards and making lending decisions (the originator) and the party making structuring decisions (the securitizer) are often exposed to minimal or no credit risk. By contrast, the party that is most exposed to credit risk (the investor) often has less influence over underwriting standards and may have less information about the borrower. As a result, originators and securitizers that do not retain risk can, at least in the short

run, maximize their own returns by lowering underwriting standards in ways that investors may have difficulty detecting.  The originate-to-distribute model, as it was conducted, exacerbated this weakness by compensating originators and securitizers based on volume, rather than on quality.

*Id*. at 3.

65.     Indeed, originators that wrote a high percentage of their loans for distribution were more likely to disregard underwriting standards, resulting in poorly performing mortgages, in contrast to originators that originated and then held most of their loans.

66.     High OTD originators profited from mortgage origination fees without bearing the risks of borrower default or insufficient collateral in the event of default.  Divorced from these risks, high OTD originators were incentivized to push loan quantity over quality.

67.     Table 5 (*infra*) shows the percentage of loans originated for distribution relative to all the loans made by the Originators for the years 2005, 2006 and 2007, for those Originators in this Complaint with high OTD percentages.   The data was obtained from the Home Mortgage Disclosure Act database.

**Table 5**
*Originator "Originate-to-Distribute" Percentages*

| Originator Name | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| Accredited Home Lenders, Inc. | 100 | 100 | 100 |
| American Mortgage Network, Inc. | | 90.3 | 71.9 |
| Wachovia Mortgage Corporation | 82.6 | 74.1 | 69.6 |

**B.     The Surge in Actual Versus Expected Cumulative Gross Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards**

68.     The actual defaults in the mortgage pools underlying the RMBS Southwest purchased exceeded expected defaults so quickly and by so wide a margin that a significant portion of the mortgages could not have been underwritten as represented in the Offering

Documents.

69.     Every month, the RMBS trustee reports the number and outstanding balance of all loans in the mortgage pools that have defaulted.  The running total of this cumulative default balance is referred to as the "gross loss."

70.     When defaulted loans are foreclosed upon, the proceeds from the foreclosures are distributed to the investors and any shortfall on the defaulted loan balances is realized as a loss. The running total of this cumulative realized loss (defaulted loan balance minus recovery in foreclosure) is referred to as the "net loss."

71.     "Actual loss" is the economic loss the mortgage pool experiences *in fact*.  So "actual gross loss" is the *actual* cumulative sum of the balance of the loans in default for a particular security.  Likewise, "actual net loss" is the *actual* cumulative realized loss on defaulted loans after foreclosure.

72.     At the time a security is rated, the rating agency calculates an amount of "expected loss" using a model based on historical performance of similar securities.  So "expected gross loss" is the *expected* cumulative sum of the balance of the loans in default for a particular security.  Likewise, "expected net loss" is the *expected* cumulative realized loss on defaulted loans after foreclosure.  The amount of expected net loss drives the credit ratings assigned to the various tranches of RMBS.

73.     Each credit rating has a "rating factor," which can be expressed in multiples of the amount of credit enhancement over expected net loss (in equation form:  $CE/ENL = RF$).  Thus, the rating factor expresses how many times the expected net loss is covered by credit enhancement.  A "triple-A" rated security would have a rating factor of "5," so would require credit enhancement of five times the amount of the expected net loss.  A "double-A rating"

would have a rating factor of "4," and thus would require credit enhancement equaling four times the expected net loss.  A "single-A" rating would have a rating factor of "3" and would require credit enhancement of three times expected net loss.  A "Baa" rating would require credit enhancement of  2—1.5 times expected net loss, and a "Ba" rating or lower requires some amount of credit enhancement less than 1.5 times expected net loss.

74.     Accordingly, by working backwards from this equation, one can infer expected net loss in an already-issued offering.  For example, assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche with a principal balance of $75 million.  This means the non-senior tranches, in aggregate, have a principal balance of $25 million.  The $25 million amount of the non-senior tranches in this hypothetical offering serves as the credit enhancement for the senior tranche.  Therefore, on our hypothetical $100 million offering, the expected net loss would be $5 million, which is the amount of the credit enhancement on the triple-A rated senior tranche—$25 million—divided by the rating factor for triple-A rated securities—5.  The following equation illustrates: $25,000,000/5 = $5,000,000.

75.     Expected gross loss can be then mathematically derived by applying an "expected recovery rate" to the expected net loss (EGL = ENL/(1 – ERR)).

76.     A comparison of actual gross losses to expected gross losses for a particular security can be made graphically by plotting the actual versus expected loss data on a line graph.  Figure 2 (*infra*) is a series of such line graphs.  Figure 2 illustrates the actual gross loss (again, actual defaults) the pools backing the RMBS purchased by Southwest experienced in the first twelve months after issuance compared to the expected gross loss (again, expected defaults) for those pools during the same time period.

77.     The actual gross loss data in Figure 2 (*infra*) was obtained from ABSNET, a

18

resource for asset-backed securities related data.  The expected gross losses were calculated by

"grossing up" the rating-implied expected net losses using an expected recovery rate of 85%.

     78.     As the graphs show, the actual gross losses (the solid lines) far exceeded the

expected gross losses (the dotted lines) for the period analyzed.  That means that the actual

balance of defaulted loans in the first twelve months following issuance far exceeded the

expected balance of defaulted loans based on historical performance.

**Figure 2**
***Illustration of Expected Gross Losses v. Actual Gross Losses for
Southwest's RMBS Purchases***

| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 1 | $                 - | $          128,410 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 2 | $          907,000 | $          140,255 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 3 | $        3,477,778 | $          153,169 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 4 | $        3,865,958 | $          167,242 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 5 | $        5,103,289 | $          182,573 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 6 | $        9,578,010 | $          199,268 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 7 | $      10,282,864 | $          217,440 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 8 | $      11,682,579 | $          237,209 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 9 | $      15,084,067 | $          258,706 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 10 | $      20,666,378 | $          282,069 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 11 | $      25,476,459 | $          307,442 |
| Wachovia Mortgage Loan Trust  Series 2006-ALT1 | 40065 | 12 | $      29,748,079 | $          334,983 |



19

| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 1 | $ - | $ 254,317 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 2 | $ - | $ 277,777 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 3 | $ - | $ 303,353 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 4 | $ - | $ 331,225 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 5 | $ 146,123 | $ 361,589 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 6 | $ 2,938,156 | $ 394,652 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 7 | $ 4,878,673 | $ 430,641 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 8 | $ 4,546,865 | $ 469,795 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 9 | $ 9,618,281 | $ 512,370 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 10 | $ 12,702,006 | $ 558,640 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 11 | $ 13,649,063 | $ 608,893 |
| Wachovia Mortgage Loan Trust Series 2006-AMN1 | 38531 | 12 | $ 18,349,579 | $ 663,437 |



79.    As clearly shown in Figure 2 (*supra*), actual gross losses spiked almost immediately after issuance of the RMBS.  Borrowers defaulted on the underlying mortgages soon after loan origination, rapidly eliminating the RMBS's credit enhancement.  For example, in the Wachovia Mortgage Loan Trust 2006-ALT1 offering, actual gross losses at month 12 exceeded $29.7 million, or more than 88 times the expected gross losses of approximately $334,983.  (*See supra* Figure 2).

80.    This immediate increase in actual losses—at a rate far greater than expected losses—is strong evidence that the Originators systematically disregarded the underwriting standards in the Offering Documents.

81.    Because credit enhancement is designed to ensure triple-A performance of triple-A rated RMBS, the evidence that credit enhancement has failed (*i.e.*, actual losses swiftly surged

past expected losses shortly after the offering) substantiates that a critical number of mortgages in the pool were not written in accordance with the underwriting guidelines stated in the Offering Documents.

**C.    The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines**

82.    Both of the RMBS certificates Southwest purchased were rated triple-A at issuance.

83.    Moody's and S&P have since downgraded the RMBS certificates Southwest purchased to well below investment grade (*see supra* Table 3).

84.    Triple-A rated product "should be able to withstand an extreme level of stress and still meet its financial obligations. A historical example of such a scenario is the Great Depression in the U.S."  Understanding Standard & Poor's Rating Definitions, June 3, 2009, at 14.

85.    A rating downgrade is material.  The total collapse in the credit ratings of the RMBS certificates Southwest purchased, typically from triple-A to non-investment speculative grade, is evidence of the Originators' systematic disregard of underwriting guidelines, amplifying that these RMBS were impaired from the outset.

**D.    Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards**

86.    Public disclosures subsequent to the issuance of the RMBS reinforce the allegation that the Originators systematically abandoned their stated underwriting guidelines.

**1.    The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse**

87.    Mortgage originators experienced unprecedented success during the mortgage boom.  Yet, their success was illusory.  As the loans they originated began to significantly

21

underperform, the demand for their products subsided.  It became evident that originators had systematically disregarded their underwriting standards.

88.     The Office of the Comptroller of the Currency (the "OCC"), an office within the Treasury Department, published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report").  In this report the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance.  The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

89.     Government reports and investigations and newspaper reports have uncovered the extent of pervasive abandonment of underwriting standards.  The Permanent Subcommittee on Investigations in the United States Senate ("PSI") recently released its report detailing the causes of the financial crisis.  Using Washington Mutual Bank as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets.  The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans.  These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50 (Subcomm. Print 2011).

90.     Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final report

in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy. *See* FIN. CRISIS INQUIRY COMM'N, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

91.     The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii.   The FCIC found:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

92.     During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan.  The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii.  Early Payment Default is a significant indicator of pervasive disregard for underwriting standards.  The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards…." *Id*.

93.     In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were

originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id*.

94.     Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards.  The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay."  *Id*. at xxiii.

95.     In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job."  *Id*. at 12-13 (internal quotation marks omitted).

96.     Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of

Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the*

*President's Working Group on Financial Markets*, Apr. 10, 2008.

97.     Investment banks securitized loans that were not originated in accordance with

underwriting guidelines and failed to disclose this fact in RMBS offering documents. As the

FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform
> adequate due diligence on the mortgages they purchased and at times knowingly
> waived compliance with underwriting standards.  Potential investors were not
> fully informed or were misled about the poor quality of the mortgages contained
> in some mortgage-related securities. These problems appear to have been
> significant.

FCIC Report at 187.

98.     Because investors had limited or no access to information concerning the actual

quality of loans underlying the RMBS, the OTD model created a situation where the origination

of low quality mortgages through poor underwriting thrived.  The FSOC found:

> In the originate-to-distribute model, originators receive significant compensation
> upfront without retaining a material ongoing economic interest in the performance
> of the loan. This reduces the economic incentive of originators and securitizers to
> evaluate the credit quality of the underlying loans carefully.   Some research
> indicates that securitization was associated with lower quality loans in the
> financial crisis. For instance, one study found that subprime borrowers with credit
> scores just above a threshold commonly used by securitizers to determine which
> loans to purchase defaulted at significantly higher rates than those with credit
> scores below the threshold.  By lower underwriting standards, securitization may
> have increased the amount of credit extended, resulting in riskier and
> unsustainable loans that otherwise may not have been originated.

FSOC Risk Retention Report at 11 (footnote omitted).

99.     The FSOC reported that as the OTD model became more pervasive in the

mortgage industry, underwriting practices weakened across the industry.  The FSOC Risk

Retention Report found "[t]his deterioration was particularly prevalent with respect to the

verification of the borrower's income, assets, and employment for residential real estate loans…

." *Id*.

100.    In sum, the disregard of underwriting standards was pervasive across originators. The failure to adhere to underwriting standards directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools collateralizing RMBS.  The lack of adherence to underwriting standards for the loans underlying RMBS was not disclosed to investors in the offering materials.  The nature of the securitization process, with the investor several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

101.    As discussed below, facts have recently come to light that at least one of the Originators who contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in these underwriting practices.

### 2.  National City Mortgage's Systematic Disregard of Underwriting Standards

102.    National City Mortgage is a division of National City Bank which is a wholly owned subsidiary of National City Corporation.  Collectively these entities are referred to as "National City."  National City originated or contributed loans to the pool of mortgages underlying the Wachovia Mortgage Loan Trust, Series 2006-ALT1 offerings.  *See infra* Table 9.

103.    Investors brought a securities fraud class action lawsuit against National City alleging that National City misrepresented the quality of its mortgage loans.  *See* Am. Class Action Compl., *In Re National City Corp. Sec., Derivative & ERISA Litig.*, No. 08-NC-70004 (N.D. Ohio filed June 13, 2008).  On August 8, 2011, it was announced that the case had settled for $168 million.

104.    National City faced another class action lawsuit alleging, among other things, that

National City did not adhere to its underwriting standards.  *See* Second Am. Class Action

Compl., *Argent Classic Convertible Arbitrage Fund (Bermuda) LTD. and Argent Classic*

*Convertible Arbitrage Fund L.P. v. National City Corp.*, et. al., No. 08-NC-70016 (N.D. Ohio

filed Feb. 19, 2010).  On November 30, 2010, the case settled for $22.5 million.

## VIII.  THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT

105.    The Offering Documents included material untrue statements or omitted facts

necessary to make the statements made, in light of the circumstances under which they were

made, not misleading.  Examples of false and misleading statements are included in this section

and the Appendix.[2]

### A.    Untrue Statements in the Offering Documents About Weighted Average LTV Ratios and Weighted Average Combined LTV Ratios

106.    The Offering Documents included detailed representations regarding the weighted

average LTV ratios for the pools underlying the RMBS.

107.    The LTV ratio is the ratio of a mortgage loan's original principal balance to the

appraised value of the mortgaged property.  For instance, if a borrower borrows $80,000 to

purchase a house estimated to be worth $100,000, the LTV ratio is $100,000/$80,000 or 80%.

108.    A "weighted average" is an average in which each value to be averaged is

assigned a weight that determines the relative importance of each value to the average.  A

weighted average can be contrasted with a straight arithmetic mean in which each of the values

to be averaged contributes equally to the average.  In the context of LTVs, the higher the balance

of the loan(s) secured by the property, the more "weight" it is given in relation to the average.

---

[2] The dates provided for the Offering Documents in the Appendix are the dates on the Offering
Documents themselves.  However, where the Offering Documents are undated, the dates
referenced are the dates such documents were filed with the SEC.

To calculate the weighted average LTV ratio for a pool of loans, each loan's LTV ratio is multiplied by the loan balance, and the sum of those numbers is divided by the total loan balance of the pool.  The weighted average LTV ratio is a factor in describing the risk of a particular RMBS.

109.    A forensic review commissioned by the NCUA Board, for the Wachovia Mortgage Loan Trust 2006-ALT1 offering, calculated LTV ratios for those loans that could be identified in the pools backing that offering.  The forensic review used a retrospective automated valuation model ("AVM").  A retrospective AVM calculates the value of a property at a point in time in the past using data that was available at that time, such as comparable property values, comparable sales, and home price indices at the time of loan origination. That is, a retrospective AVM is able to calculate the value of a property in 2006 using the data that was available in 2006.

110.    The forensic review commissioned by the NCUA Board calculated the value of the mortgaged properties underlying the RMBS at the time the mortgage loans were originated. For the Wachovia Mortgage Loan Trust 2006-ALT1, 35.3% of the loans were analyzed.

111.    The forensic review demonstrated that for the Wachovia Mortgage Loan Trust 2006-ALT1 offering, the Offering Documents materially understated the LTV ratios, and thus the risks, of the mortgage pools.  Further, for the Offering in Table 6, the appraised values given to the mortgaged properties were significantly higher than what the properties were actually worth at the time of origination.

112.    For the Wachovia Mortgage Loan Trust 2006-ALT1 offering, the Offering Documents contained representations about the purported weighted average LTV ratios for the loan pools.  The forensic review found that for the Wachovia Mortgage Loan Trust 2006-ALT1

28

offering, the actual weighted average LTV ratio was 17% higher than the weighted average LTV

ratio reported in the Offering Documents.  *See infra* Table 6.

**Table 6**
*Untrue Statements in the Offering Documents About Weighted Average LTV Ratios*

| ISSUING ENTITY | Represented Weighted Average LTV Ratio | Actual Weighted Average LTV Ratio | Actual Weighted Average LTV     % Higher than Represented |
|---|---|---|---|
| Wachovia Mortgage Loan Trust, Series 2006-ALT1 (Aggregate) | 76.12% | 89.07% | 17% |

113.    The discrepancy between the reported weighted average LTV ratio and the ratio

calculated using the retroactive AVM provides additional evidence that the Originators

systematically disregarded underwriting standards contrary to representations in the Offering

Documents for the Wachovia Mortgage Loan Trust 2006-ALT1 offering.  Where the weighted

average LTV is close to or exceeds 100% for the RMBS, the borrowers collectively had virtually

no equity in the mortgaged properties, increasing the risk of losses when the borrowers defaulted

on the mortgaged properties.  The actual weighted LTV ratio shows that the RMBS were

significantly riskier than represented in the Offering Documents for many of the Offerings.

114.    The Offering Documents for the Wachovia Mortgage Loan Trust 2006-ALT1

offering also contained aggregated loan-by-loan statistics about the weighted average CLTV

ratio for the pool underlying that Offering.  The related CLTV ratio takes into account other liens

on the property, such as a second mortgage.  The CLTV ratio adds additional specificity to the

basic LTV ratio by indicating that additional liens on the property have been considered in the

calculation of the ratio.  Like the LTV ratio, the CLTV ratio is a key statistic for investors in

evaluating both the price and the risk of the RMBS.

115.     Because the representation in the Offering Documents regarding the CLTV ratio on the Wachovia Mortgage Loan Trust offering was based on false loan-level information, the aggregated statistic was also false.

116.     Table 7, below, shows the difference between the weighted average CLTV ratio represented in the Offering Documents and the actual weighted average CLTV ratio as revealed by the forensic review.  For the Offering in Table 7, 35.3% of the loans were analyzed by the forensic review commissioned by the NCUA Board.  The forensic review shows that for the Offering in Table 7, the actual weighted average CLTV ratio was 19.7% higher than the weighted average CLTV ratio represented in the Offering Documents.

**Table 7**
***Untrue Statements in the Offering Documents About Weighted Average CLTV***

| ISSUING ENTITY | Represented Weighted Average CLTV Ratio | Actual Weighted Average CLTV Ratio | Actual Weighted Average CLTV ___% Higher than Represented |
|---|---|---|---|
| Wachovia Mortgage Loan Trust, Series 2006-ALT1 (Aggregate) | 85.72% | 102.64% | 19.7% |

117.     The discrepancy between the reported weighted average CLTV ratio and the ratio calculated using the retroactive AVM on the Offering in Table 7, above, provides additional evidence that the Originators systematically disregarded underwriting standards contrary to representations in the Offering Documents.  Where the weighted average CLTV is close to or exceeds 100% for the RMBS, the borrowers collectively had virtually no equity in the mortgaged properties, increasing the risk of losses when the borrowers defaulted on the mortgaged properties.  The actual weighted CLTV ratio shows that the RMBS was significantly riskier than represented in the Offering Documents.

**B.     Untrue Statements in the Offering Documents About Owner Occupancy Rates**

118.    The Offering Documents represented the percentage of properties that would be occupied by the borrower for the loans underlying each RMBS.

119.    Representations regarding the occupancy type of a mortgaged property are material because borrowers are less likely to default on mortgages on their primary residences. Barclays Capital explained:

> Most home owners become anchored to their communities through the schools their children attend and the friends they make.  As a result, defaulting on the mortgage backing one's primary residence can be a jarring experience, one that most people would choose to avoid.  By contrast, an investment property primarily represents a stream of income or speculative opportunity, making the decision to default more one of dollars and cents than of a major life change.  As a result, all else being equal, borrowers are less likely to default on a mortgage backed by their primary residence than on one backed by an investment property.

Barclays Capital, Barclays Loan Transition Model, at 9 (Nov. 30, 2010).

120.    The forensic review used borrower- and property-specific public records to test loan-level occupancy data for the Offering in Table 8, below.

121.    First, the forensic review analyzed contemporaneous property tax records to determine whether: (1) borrowers received their property tax bill for the mortgaged property at the address of the mortgaged property; and (2) borrowers took a property tax exemption on the mortgaged property that is only available for owner-occupied properties.  Borrowers are likely to have a tax bill sent to their primary residence to ensure their ability to make timely payment. However, if borrowers had tax records sent to a different address, then they probably did not actually reside at the mortgaged property.  And if borrowers declined to make certain tax exemption elections dependent on the borrowers residing at the property, then the borrowers also probably did not reside at the mortgaged property.

122.    Second, the forensic review analyzed public records to determine whether borrowers owned any other properties during the same time period in which they owned the

securitized property.  The forensic review then examined whether the borrowers consistently identified the securitized property as their mailing address for property tax bills on each concurrently owned property.  Inconsistencies in tax bill mailing addresses for concurrently-owned properties also indicate that the securitized property was not, in fact, owner-occupied.

123.    Third, the forensic review conducted a review of lien records on concurrently-owned properties to determine whether borrowers indicated that any property other than the securitized property was owner-occupied.  This test examines all liens originated after the securitized mortgage and compares owner-occupancy representations with those in the loan tapes.  If liens on concurrently-owned properties indicate that those properties are owner-occupied, then the borrower probably did not reside at the mortgaged property.

124.    Fourth, the forensic review examined the mailing addresses identified for liens on concurrently-owned properties to determine whether the address of the securitized property was listed as the mailing address for bills and other correspondence between borrowers and the lienholders.  If the securitized property address is not identified in either scenario, then that is an indication that the borrower did not reside at the mortgaged property.

125.    Finally, the forensic review studied credit records to help determine whether a given borrower occupied the mortgaged property.  Specifically, the forensic review investigated whether any creditors were reporting the securitized property's address as the borrower's mailing address six months after the origination of the loan.  Within six months of closing on a mortgage, one would expect borrowers to have changed their billing address with each of their creditors.  If a borrower was telling creditors to send bills to another address even six months after buying the property, it is likely the borrower was living at a different location.

126.    In assessing the accuracy of the Offering Documents' representations about

owner-occupancy, the forensic review considered mortgages that failed multiple owner-occupancy tests to not have actually have been backed by owner-occupied properties. Even with this high threshold, the forensic review revealed systematic overstatements of owner-occupancy rates for the Wachovia Mortgage Loan Trust 2006-ALT1 offering.

127.     Table 8, below, shows the difference in the percentage of owner-occupied properties as represented in the Offering Documents and the actual percentage of owner-occupied properties as revealed by the forensic review. For the Wachovia Mortgage Loan Trust 2006-ALT1 offering, 61.3% of the loans were analyzed by the forensic review commissioned by the NCUA Board. The forensic review shows that for the Wachovia Mortgage Loan Trust 2006-ALT1 offering, the actual percentage of owner-occupied properties was, on average, 20.4% lower than the percentage of owner-occupied properties represented in the Offering Documents.

**Table 8**
***Untrue Statements in the Offering Documents About Owner-Occupancy Status***

| ISSUING ENTITY | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Percentage Overstatement |
|---|---|---|---|
| Wachovia Mortgage Loan Trust, Series 2006-ALT1 (Aggregate) | 67.8% | 56.3% | 20.4% |

**C.     Other Untrue Statements in the Offering Documents**

128.     Statements in the Offering Documents concerning the following subjects were material and untrue at the time they were made: (1) the loans adhered to the applicable underwriting guidelines, including that exceptions to those guidelines would only be granted when warranted by compensating factors; (2) the loans adhered to certain underwriting standards for reduced documentation programs; and (3) that appraisals were accurate, that loans had certain LTV ratios individually and in the aggregate, and that the borrowers had certain debt-to-income ("DTI") ratios.

33

129.     The following table lists the originators that contributed loans to each RMBS, as identified in the Offering Documents.  Under SEC's Regulation AB, the Offering Documents must disclose the originators that contributed more than 10% of the loans underlying the RMBS, and the Offering Documents must include underwriting guidelines for the originators that contributed more than 20% of the loans underlying the RMBS.  *See* 17 C.F.R. § 229.1110 (2005).  For the RMBS listed below, the Offering Documents included only those underwriting guidelines for the Originators that contributed more than 20% of the loans to the RMBS.

**Table 9**
***Originators Supplying Loans for Each RMBS at Issue***

| CUSIP | Issuing Entity | Tranche | Originator(s) |
|---|---|---|---|
| 92978GAA7 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 | A-1 | National City Mortgage Co. (65.93%) Accredited Home Lenders, Inc. (18.88%) Wachovia Mortgage Corp. (12.44%) American Mortgage Network, Inc. (2.75%) |
| 92978EAB0 | Wachovia Mortgage Loan Trust, Series 2006-AMN1 | A-2 | American Mortgage Network, Inc. (100%) |

130.     Examples of material untrue statements and/or omissions of fact in the Offering Documents of the RMBS listed above follow.

**1.     Untrue Statements Concerning Adherence to Underwriting Guidelines**

131.     The Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement stated:

> National City Mortgage's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations. Exceptions to the underwriting standards are permitted where compensating factors are present.

Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement at S-34.

132.    The Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement

continued:

> In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligation on the proposed mortgage loan, the originator generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income. Such ratios vary depending on a number of underwriting criteria, including loan-to-value ratios, and are determined on a loan-by-loan basis.

Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement at S-35.

133.    The Wachovia Mortgage Loan Trust, Series 2006-AMN1 Prospectus Supplement

stated:

> The Mortgage Loans were originated or purchased by [American Mortgage Network "AmNet"] (either directly or through affiliates) from mortgage loan brokers. The Mortgage Loans have been originated in accordance with the underwriting criteria specified below.
>
> AmNet believes that the Mortgage Loans were underwritten in accordance with standards consistent with those utilized by mortgage lenders generally during the period of origination.
>
> Underwriting standards are applied by or on behalf of AmNet to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral. In general, a prospective borrower applying for a mortgage loan is required to fill out a detailed application designed to provide to the underwriter pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities, employment information and payment information, as well as authorization to acquire a credit report which summarized the borrower's credit history with merchants and lenders and record of bankruptcy or other public records. The borrower may be required to provide income documentation such as W-2 statements and current pay stubs to verify income and employment or verification may be obtained from an independent source (typically the borrower's employer) which verification reports the length of employment with that organization, the current salary, and whether it is expected that the borrower will continue such employment in the future. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposit at financial institutions where the borrower has demand or

savings accounts or provide copies of bank statements to verify assets.

Wachovia Mortgage Loan Trust, Series 2006-AMN1 Prospectus Supplement at S-30.

134.    The Wachovia Mortgage Loan Trust, Series 2006-AMN1 Prospectus Supplement

stated:

> In the case of all mortgage loans, once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available (a) to meet the borrower's monthly obligations on the proposed mortgage loan (determined on the basis of the monthly payments due in the year of origination) and other expenses related to the mortgage property (such as property taxes and hazard insurance) and (b) to meet monthly housing expenses and other financial obligations and monthly living expenses. The underwriting standards applied by AmNet may be varied in appropriate cases where factors such as low loan-to-value ratios or other compensating factors exist. However, maximum combined loan-to-value ratios and maximum loan amounts are generally limited by credit score and total debt-to-income ratios.

Wachovia Mortgage Loan Trust, Series 2006-AMN1 Prospectus Supplement at S-31.

135.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding

statements were material at the time they were made, because the quality of the loans in the

mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans

is dependent upon the underwriting process employed.  The preceding statements were untrue at

the time they were made because, among other things, the Originators did not adhere to the

stated underwriting guidelines, did not effectively evaluate the borrowers' ability or likelihood to

repay the loans, did not properly evaluate whether the borrower's debt-to-income ratio supported

a conclusion that the borrower had the means to meet his/her monthly obligations, and did not

ensure that adequate compensating factors justified the granting of exceptions to guidelines.

### 2.    Untrue Statements Concerning Adherence to Reduced Documentation Program Underwriting Guidelines

136.    The Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement

stated:

> Full/Alternative Documentation. Under full documentation, the prospective borrower's employment, income and assets are verified through written and telephonic communications, covering a 2-year period for employment/income and a 2-month period for assets.
>
> Typically the following documentation is required but not limited to:
>
>   - Verbal verification of employment
>   - Pay stubs covering the most recent 30 day period showing YTD income
>   - Most recent 2 year's 1040s for self-employed borrowers
>   - 1 or 2 months bank statements
>   - W-2 forms for 24 months
>
> Stated Documentation.  Under a stated income documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower. Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income. Employment stability is a critical component in evaluating the borrower's continuing ability to meet obligations. Borrower's assets may or may not be verified.
>
> No Ratio Documentation.  Under a stated income documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower.   Under the no ratio documentation program the borrower's income is not stated and no ratios are calculated. Although the income is not stated nor verified, lenders obtain a telephonic verification of the borrower's employment without reference to income.
>
> No Income/No Employment/No Asset Documentation (NO DOC).  Under the no income/no employment/no asset documentation program, income, employment and assets are not stated.  The underwriting of such mortgage loans is based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower.
>
> No Income/No Asset/Employment Verified (NINA).  Under the no income/no asset/employment verified documentation program, the borrower's income and assets are not disclosed.  A verbal verification of employment is required. Employment stability is a critical component in evaluating the borrower's continuing ability to meet obligations.  The underwriting of such mortgage loans

is based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower.

Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement at S-35-36.

137. The Wachovia Mortgage Loan Trust, Series 2006-AMN1 Prospectus Supplement stated:

> AmNet originates mortgage loans under reduced documentation programs. These reduced documentation programs include a "Stated Income" program, where there is no verification of stated income, a "Stated Income/Stated Assets" program, where there is no verification of stated income or stated assets, a "No Income/No Assets/No Employment" program, where there is no verification of income, assets or employment, and a "No Ratio Documentation" program, where there is no stated income, thus eliminating ratio calculations. A reduced documentation program is designed to streamline the loan approval process and thereby improve the lender's competitive position among other loan originators. Under a reduced documentation program, in determining the prospective borrower's repayment ability, relatively more emphasis is placed on credit score and property underwriting than on certain credit underwriting documentation concerning income and employment verification.

Wachovia Mortgage Loan Trust, Series 2006-AMN1 Prospectus Supplement at S-31.

138. UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed.  The preceding statements were untrue at the time they were made, because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines.

### 3. Untrue Statements Concerning Loan-to-Value Ratios, Owner-Occupancy Rates, and DTI Ratios

139. The Offering Documents provided statistical descriptions of the collateral, such as LTV ratios, CLTV ratios, owner-occupancy rates, and DTI ratios.  *See*, *e.g.*, Wachovia Mortgage Loan Trust, Series 2006-ALT1, Prospectus Supplement, at Annex 1.

38

140.    The Offering Documents represented that independent and objective appraisals were obtained for the properties.  *See*, *e.g.*, Wachovia Mortgage Loan Trust, Series 2006-ALT1, Prospectus Supplement, S-36 ("All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of Appraisal Foundation").

141.    The Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement stated:

> In general, Accredited's LTV maximums decrease with credit quality, and, within each credit classification, the LTV maximums vary depending on the property type.  LTV maximums for mortgage loans secured by owner-occupied properties are higher than for mortgage loans secured by properties that are not owner-occupied.  LTV maximums for Lite Documentation and Stated Income programs are generally lower than the LTV maximums for corresponding Full Documentation programs.  Our maximum debt-to-income ratios range from 50% to 55% for Full Documentation programs, and maximum 50% for Lite Documentation and Stated Income Programs.

Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement at S-39.

142.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made because the riskiness of the RMBS investment is directly dependent on the quality of the collateral and creditworthiness of the borrowers.  The preceding statements were untrue at the time they were made because the LTV ratios were higher than represented, and the DTI ratios were higher than represented.

## IX.    THE CLAIMS ARE TIMELY

143.    For actions brought by the NCUA Board as Liquidating Agent, the FCUA extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent.  *See* 12 U.S.C. § 1787(b)(14)(B)(i).

144.    The NCUA Board placed Southwest into conservatorship on September 24, 2010.

On October 31, 2010, the NCUA Board placed Southwest into liquidation and appointed itself as Liquidating Agent.  15 U.S.C. § 77m.

145.    Actions brought under Section 581-33 of the Texas Blue Sky Law must be brought no "(a) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence; or (b) more than five years after the sale."  Tex. Rev. Civ. Stat. Ann. art. 581, § 33(H)(2).

146.    As the Federal Reserve Board noted in November 2008, the "deteriorating lending standards" and "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors."  Christopher J. Mayer *et al.*, *The Rise in Mortgage Defaults* 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59).

147.    The FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical information concerning the quality and performance of RMBS.   The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

> One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor. An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan. Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information. Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

148.    With respect to those RMBS purchases for which the NCUA Board asserts claims under state law (Count One), the earliest purchase date/offering date with respect to those claims

was June 9, 2006, or not more than five years prior to September 24, 2010. Accordingly, the

NCUA Board's state law claims are not time-barred.


**X.      CLAIMS FOR RELIEF**

<u>**COUNT ONE**</u>
**Violation of the Texas Securities Act**
**Tex. Rev. Civ. Stat. Ann. art. 581, § 33**
**(Wachovia Mortgage Loan Trust, Series 2006-AMN1,**
**Wachovia Mortgage Loan Trust, Series 2006-ALT1)**

149.     The NCUA Board realleges paragraphs 1 through 148 of this Complaint, as

though fully set forth here.

150.     The NCUA Board brings this cause of action pursuant to Section 33 of the Texas

Securities Act, with respect to Southwest's purchases of the Wachovia Mortgage Loan Trust,

Series 2006-AMN1 and Wachovia Mortgage Loan Trust, Series 2006-ALT1 certificates against

Defendant Wachovia as the seller of those certificates.

151.     Defendant Wachovia offered to sell and sold the certificates to Southwest by

means of written and/or oral communications which included untrue statements of material fact

and/or omissions of material facts that were necessary to make the statements made not

misleading, as alleged above.

152.     The untrue statements of material fact and omitted facts were material because a

reasonably prudent investor deciding whether to purchase the certificates would have viewed

them as important and as substantially altering the total mix of information available, as alleged

above.

153.     Defendant Wachovia sold the certificates to Southwest in Texas.

154.     At the time Southwest purchased the certificates, it did not know of these untruths

and omissions.

155.    If Southwest had known about these untruths and omissions, it would not have purchased the certificates from Defendant Wachovia.

156.    Defendant Wachovia's sales of the certificates violated Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2).

157.    Southwest and Plaintiff sustained damages as a result of Defendant Wachovia's violations of Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2).

158.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Wachovia, awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

## Jury Demand

Plaintiff hereby demands a trial by jury of all issues properly triable.

Dated:  November 14, 2014

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent of Southwest Corporate
Federal Credit Union


By:  \s\ David H. Wollmuth          _
David H. Wollmuth
Steven S. Fitzgerald
Ryan A. Kane
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
Phone:  (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751

Mark C. Hansen
David C. Frederick
Wan J. Kim
Gregory G. Rapawy
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999

Stephen M. Tillery
Greg G. Gutzler
Tamara M. Spicer
Steven M. Berezney
Michael E. Klenov
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525

*Attorneys for the National Credit Union
Administration Board*

Of Counsel:
Michael J. McKenna, General Counsel
John K. Ianno, Associate General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314

## Appendix

### I. WMLT 2006-ALT1

- **[Underwriting Standards]** The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-34 to S-39 (December 19, 2006); *see also* Preliminary Prospectus Supplement at S-34 to S-39 (December 1, 2006).

- **[Summary Statistics]** The summary statistical information for the loans, such as LTV, CLTV, DTI, and owner-occupancy ratios, was false and misleading.  *See* Prospectus Supplement at S-10, Annex I (December 19, 2006); *see also* Preliminary Prospectus Supplement at S-10, Annex I (December 1, 2006).

- **[Mortgage Loan Schedule]** The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios. *E.g.* Free Writing Prospectus (November 29, 2006); *see also* Amendment No. 3 to Registration Statement at 56 (April 28, 2006).

- **[100% LTV or CLTV]**  "As of the Cut-off Date, no Mortgage Loan had a Loan-to-Value Ratio of more than 95.00%."  Prospectus Supplement at S-32 (December 19, 2006); *see also* Preliminary Prospectus Supplement at S-32 (December 1, 2006).

- **[Loans comply with applicable laws]** "Federal, state and local laws regulate the underwriting, origination, servicing and Laws collection of the mortgage loans." Prospectus Supplement at S-27 (December 19, 2006); *see also* Preliminary Prospectus Supplement at S-27 (December 1, 2006).

### II. WMLT 2006-AMN1

- **[Underwriting Standards]** The statements regarding the underwriting standards used to originate the loans were false and misleading.  *See* Prospectus Supplement at S-30 to S-31 (June 26, 2006); *see also* Preliminary Prospectus Supplement at S-30 to S-31 (June 8, 2006).

- **[Summary Statistics]** The summary statistical information for the loans, such as LTV, CLTV, DTI, and owner-occupancy ratios, was false and misleading.  *See* Prospectus Supplement at Annex I (June 26, 2006); *see also* Preliminary Prospectus Supplement at Annex I (June 8, 2006); Free Writing Prospectus at 23-30 (June 7, 2006).

- **[Mortgage Loan Schedule]** The statements in the mortgage loan schedule were false and misleading in numerous aspects, such as LTV, CLTV, DTI, and owner-occupancy ratios. *See also* Prospectus at 56 (May 23, 2006); Amendment No. 3 to Registration Statement at 56 (April 28, 2006).

- **[Loans comply with applicable laws]** "Federal, state and local laws regulate the underwriting, origination, servicing and collection of the mortgage loans." Prospectus Supplement at S-25; *see also* Preliminary Prospectus Supplement at S-24 (June 8, 2006).